MAXWELL, J.,
for the Court:
¶ 1. Alonzo Smith suffered an on-the-job injury while employed by Johnston Tom-bigbee Furniture Manufacturing Company (“Johnston Tombigbee”). Johnston Tom-bigbee and its insurance carrier, Bridge-field Casualty Insurance Company (“Bridgefield”), admitted compensability, but disputed Smith’s claims as to the extent of his disability. The administrative law judge (ALJ) found Smith permanently and totally disabled. The Workers’ Compensation Commission (“Commission”) affirmed the ALJ’s finding of compensability, but reversed her award of disability benefits. The Commission amended the ALJ’s order to reflect a thirty-percent (30%) permanent partial disability award. On appeal, the Lowndes County Circuit Court affirmed the Commission’s decision.
¶ 2. Employing our limited standard of review, we are unable to say the Commission erred as a matter of law or acted in an arbitrary and capricious manner. Therefore, we affirm.
FACTS
I. Employment History
¶ 3. Smith was an employee of Johnston Tombigbee in Columbus, Mississippi, for about thirty-five years. Smith spent many of his years there as a machine operator. This position mainly involved operating heavy equipment and lifting boards onto a panel saw to make bedroom suites. Smith eventually became an assistant supervisor in 1976. However, he returned to his former duties as a machine operator in 1994, which he performed for the remainder of his employment at Johnston Tombigbee. According to Smith, this change of position was due to company lay-offs.
II. Injury and Medical Treatment
¶4. On June 26, 2003, Smith fell while pushing a load of boards onto a press, and suffered an injury to his lower back. It is undisputed that he had no pre-existing problems with his back. Smith continued to work for Johnston Tombigbee until he went to the emergency room of Baptist Memorial Hospital in Columbus a couple of *1162 weeks after his work accident. While at Baptist Hospital, Smith received diagnostic tests, and a physician there referred him to Dr. David Chang with Columbus Neurosurgery for further treatment.
¶ 5. At first, Dr. Chang treated Smith with medication and directed that he attend physical therapy sessions. After this conservative treatment did not significantly relieve Smith’s pain, Dr. Chang performed back surgery (a right L4-5 lumbar discectomy) on Smith in January 2004. Smith testified that he began to experience problems with numbness in his right leg shortly after the back surgery. In Dr. Chang’s notes, he indicated that Smith showed signs of right foot drop, but Dr. Chang was unable to explain these symptoms. Following Smith’s complaints about his leg, Dr. Chang referred Smith to Dr. Art Leis of Jackson, Mississippi, to conduct nerve studies.
¶ 6. Dr. Leis found Smith had slight focal atrophy in his right leg, but believed Smith’s complaints of diminished sensation and weakness in his leg were largely non-physiologic. Dr. Leis observed: “Apparent non-physiologic weakness and sensory loss influence the neurological examination and confound interpretation and future management.” He also opined that these same non-physiologic complaints suggested “possible malingering or secondary gain that may influence future management.”
¶ 7. Dr. Chang treated Smith for about one-and-a-half years. He then released Smith on October 28, 2004, finding that Smith had reached maximum medical improvement (MMI).[1] On this date, Dr. Chang assigned to Smith a ten-percent (10%) impairment to the whole body, and did not assign any work restrictions.[2]
¶ 8. After being released by Dr. Chang, Smith sought pain-management treatment from orthopedic surgeon Dr. James T. Barnett, Jr. of Tuscaloosa, Alabama. Dr. Barnett apparently prescribed a cane, leg brace, back brace, and special shoes for Smith. He also prescribed Smith to take 800 milligrams of Neurotin three times per day. The ALJ found Smith was responsible for paying the medical bills from the services of Dr. Barnett. The Commission affirmed this decision, which Smith does not challenge.
¶ 9. On November 17, 2005, Dr. Rahul Vohra of Jackson, Mississippi, examined Smith at Bridgefield’s request. This was the only time Smith ever saw Dr. Vohra. According to Dr. Vohra’s report and deposition testimony, he could find no objective explanation for Smith’s complaints of weakness. He also found no objective explanation to support Smith’s claims about the severity of his symptoms. Although Dr. Vohra found that Smith had the presence of mild lumbar paraspinal spasms, and thought that it was reasonable for Smith to be prescribed medication for his subjective pain complaints, Dr. Vohra did not believe Smith needed any other further treatment. Dr. Vohra did not believe Smith showed any significant signs of atrophy or foot drop. Dr. Vohra also found no medical need for Smith to have a back brace or foot brace. Dr. Vohra further observed that Smith exhibited pain amplification behavior, a non-organic symptom. According to Dr. Vohra’s deposition, there were only two explanations for the inconsistency between Smith’s story and the medical evidence: Either Smith had a psychological disorder, or he was intentionally *1163 misrepresenting his symptoms.[3] Dr. Voh-ra assigned Smith a five-percent (5%) impairment to the body as a whole, and released him without any work restrictions.
III. Job Search Efforts
¶ 10. Smith offered an exhibit showing his purported job-search efforts. Therein, Smith recorded the date he allegedly inquired about potential work; the name of the businesses; their addresses; and whether he applied for work, or the businesses were not hiring. According to Smith’s list, he searched for work at 135 places of employment. The list indicates that Smith looked for work at fifteen locations during each of nine different months from August 2006 to August 2007. According to Smith, the vast majority of the businesses were not hiring. Smith claimed he followed up with some of these businesses to see if a position had become available. However, Smith claimed none of these inquiries resulted in job offers.
¶ 11. Smith’s documented search efforts did not commence until nearly two years after he reached MMI. The parties disagree over the reason for this fact. Johnston Tombigbee maintains Smith did not reasonably search for jobs before this time. Smith contends he diligently searched for work but did not document his efforts until well after reaching MMI.
¶ 12. Smith concedes that he never returned to his employer after the date of MMI to inquire about employment opportunities. According to Smith, he was told that there was no light-duty work at Johnston Tombigbee available. The only other evidence in the record supporting the unavailability of work at Johnston Tombigbee was produced in anticipation of litigation, where Johnston Furniture stated in an interrogatory response that it was unable to provide “light duty” work. It is undisputed Smith did not reapply or otherwise inquire about work at Johnston Tombigbee after reaching MMI.
¶ 13. Johnston Tombigbee retained vocational expert Dennis Stewart to assist Smith in finding employment. Stewart conducted two labor market surveys. Based on his research, Stewart testified there were various jobs available that Smith was capable of performing. Stewart testified that each potential employer was contacted to ensure that employment was available. The record does not indicate that Smith ever contacted any of these potential employers. However, Stewart admitted on cross-examination that some of the jobs he identified might involve some lifting. In addition, Stewart admitted that he did not learn Smith had experience as a supervisor until after compiling his report. Thus, Smith’s management-level experience was not factored into his findings. Furthermore, Stewart admitted he did not attempt to find work for Smith until over two years after Smith had reached MMI. Finally, Stewart never met personally with Smith. The parties disagree over why the two never met in person. Johnston Tombigbee alleges Smith failed to fully cooperate with its vocational expert. Smith claims he was willing to meet with Stewart, but only with his attorney present.
PROCEDURAL HISTORY
¶ 14. On March 16, 2005, Smith filed a petition to controvert with the Workers’ Compensation Commission. After conducting a hearing, the ALJ found Smith *1164 had suffered a permanent total disability, and ordered Johnston Tombigbee and Bridgefield to provide Smith compensation benefits for a period of 450 weeks. The Commission, however, disagreed. It found Smith had failed to prove by a preponderance of the evidence he had suffered a permanent total disability. Although the Commission affirmed the ALJ’s finding of compensability, it reversed and amended the ALJ’s award of disability benefits to reflect a thirty-percent (30%) permanent partial disability award for a period of 450 weeks. The Commission later amended its own order to correct a mathematical calculation in its original order. On appeal, the circuit court deferred to the Commission in its role as fact-finder, and affirmed its decision.
STANDARD OF REVIEW
¶ 15. Our standard of review in actions arising under Workers’ Compensation Law is limited to determining whether the Commission erred as a matter of law or made findings of fact contrary to the overwhelming weight of the evidence. Clements v. Welling Truck Serv., Inc., 739 So.2d 476, 478 (¶ 7) (Miss.Ct.App.1999) (citing Fought v. Stuart C. Irby Co., 523 So.2d 314, 317 (Miss.1988)). “Reversal is proper only when a Commission order is not based on substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law.” Weatherspoon v. Croft Metals, Inc., 853 So.2d 776, 778 (¶6) (Miss.2003). Our supreme court has also stated the Commission will only be reversed “for an error of law or an unsupportable finding of fact.” Ga. Pac. Corp. v. Taplin, 586 So.2d 823, 826 (Miss.1991) (internal citations omitted). When the Commission’s decision is supported by substantial evidence, then it must be upheld. Vance v. Twin River Homes, Inc., 641 So.2d 1176, 1180 (Miss.1994). This remains true even though we might have reached a different conclusion were we the trier of fact. Id.
¶ 16. “Where no evidence or only a scintilla of evidence supports [the Commission’s] decision, this Court does not hesitate to reverse.” Taylor v. First Chem., 19 So.3d 160, 163 (¶ 12) (Miss.Ct.App.2009). However, “[a] reviewing court commits error if it simply re-weighs the evidence and substitutes its judgment for that of the Commission.” Lifestyle Furnishings v. Tollison, 985 So.2d 352, 358 (¶ 17) (2008) (citing Raytheon Aerospace Support Servs. v. Miller, 861 So.2d 330, 335 (¶ 11) (Miss.2003)). Our role is not “to determine where the preponderance of the evidence lies when the evidence is conflicting, [since] it is presumed that the Commission, as trier of fact, has previously determined which evidence is credible and which is not.” Hale v. Ruleville Health Care Ctr., 687 So.2d 1221, 1224-25 (Miss.1997).
¶ 17. We must bear in mind that “the Commission, not the administrative judge, is the ultimate fact-finder, and this Court will apply a general deferential standard of review to the Commission’s findings and decisions despite the actions of the administrative judge.” Smith v. Jackson Constr. Co., 607 So.2d 1119, 1123-24 (Miss.1992) (citations omitted). In reviewing the Commission’s findings, the circuit court sits as an appellate court and applies the same deferential standard applied by this Court. Tollison, 985 So.2d at 358 (¶ 15) (citation omitted).
DISCUSSION
I. Disability
¶ 18. We must decide whether the Commission’s award of thirty-percent (30%) permanent partial disability benefits, and the circuit court’s decision affirming *1165 the Commission, was error as a matter of law or was against the overwhelming weight of the evidence.
¶ 19. Mississippi Code Annotated section Yl — 3—3(i) (Rev.2000) defines “disability” as “incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings.” The concept of disability has components of both a physical injury and a loss of wage-earning capacity. Univ. of Miss. Med. Ctr. v. Smith, 909 So.2d 1209, 1218 (¶ 31) (Miss.Ct.App.2005) (citing I. Taitel & Son v. Twiner, 247 Miss. 785, 792, 157 So.2d 44, 46 (Miss.1963)). In order to meet the definition of disability, the claimant must not be able to obtain work in similar or other jobs, and the claimant’s unemploya-bility must be due to the injury in question. Taplin, 586 So.2d at 828 (citing V. Dunn, Mississippi Workmen’s Compensation § 72.1 (3d ed.1982)). The employee’s degree of disability is assessed “by comparing the employee’s pre-injury wages with the employee’s post-injury capacity to earn wages in the open labor market.” Smith, 909 So.2d at 1218 (¶ 31) (citing Karr v. Armstrong Tire & Rubber Co., 216 Miss. 132, 137, 61 So.2d 789, 792 (1953)).
¶ 20. Mississippi Code Annotated section 71-3-17(a) (Rev.2000) contains the applicable criteria for determining whether permanent total disability benefits are appropriate.[4] The statute lists certain injuries that automatically qualify an employee for permanent total disability benefits: “Loss of both hands, or both arms, or both feet, or both legs, or both eyes, or of any two (2) thereof shall constitute permanent total disability.” Id. The subsection further provides: “In all other cases permanent total disability shall be determined in accordance with the facts.” Id. Here, the Commission was obviously confronted with a fact-intensive determination since Smith’s injury is not specifically enumerated in the statute.
¶ 21. It is well settled that workers’ compensation claimants have “the burden of proving disability and the extent thereof.” Tollison, 985 So.2d at 359 (¶ 21). “The issue of whether a claimant’s permanent disability is partial or total is a fact question to be determined from the evidence as a whole, including both medical and lay testimony.” Smith, 909 So.2d at 1222 (¶ 47) (citing McGowan v. Orleans Furniture, Inc., 586 So.2d 163, 167 (Miss.1991)).
¶ 22. A burden-shifting framework applies to claims of permanent total disability. Tollison, 985 So.2d at 359-60 (¶ 21). The claimant is required to make a prima facie showing that “he has sought and been unable to find work ‘in the same or other employment.’ ” Hale, 687 So.2d at 1226 (quoting Miss.Code Ann. § 71 — 3—3(i)). Two methods of making this required showing have been recognized by our supreme court. Tollison, 985 So.2d at 359-60 (¶ 21). First, the claimant may make a prima facie case by reporting back to the employer after reaching MMI when the employer refuses to reinstate the claimant. Jordan v. Hercules, Inc., 600 So.2d 179, *1166 183 (Miss.1992). Second, the claimant may establish a prima facie case by proving reasonable efforts to find other employment. Thompson v. Wells-Lamont Corp., 362 So.2d 638, 640-41 (Miss.1978). These two methods have been referred to collectively as the Jordan/Thompson test. Tollison, 985 So.2d at 359-60 (¶21). The following factors are considered in assessing the reasonableness of job search efforts: (1) job availability within the community, (2) the local economy, (3) the claimant’s skills and background, and (4) the disability itself. Taplin, 586 So.2d at 828.
¶ 23. Another consideration in assessing a workers’ compensation claimant’s disability is loss of wage-earning capacity. As our supreme court has held, “[a]n employee is entitled to compensation to the extent that he has been incapacitated to earn wages.” Marshall Durbin, Inc. v. Hall, 490 So.2d 877, 880 (Miss.1986). The following factors should be considered in determining loss of wage-earning capacity: “the amount of education and training that the claimant has had, his inability to work, his failure to be hired elsewhere, the continuance of pain, and any other related circumstances.” Alumax Extrusions, Inc. v. Wright, 737 So.2d 416, 422 (¶ 16) (Miss.Ct.App.1998) (citing McGowan, 586 So.2d at 167). However, we have held that “the ability to earn post-injury wages, even significantly diminished post-injury wages, defeats a claim of permanent total disability.” Hill v. Mel, Inc., 989 So.2d 969, 972 (¶ 14) (Miss.Ct.App.2008).
¶ 24. In the present case, the Commission held that Smith had “failed to prove by a preponderance of credible evidence that he has suffered permanent total disability.” The Commission found appropriate to amend the ALJ’s order to reflect a thirty-pereent (30%) permanent partial disability award, which the Commission based on the following findings of fact:
The claimant misrepresented the fact that he was put on restrictive duty when in fact the medical evidence points to the contrary; the claimant failed to engage in a meaningful job search to support his claim for total disability despite the effort of the employer and carrier to provide him access to a vocational rehabilitation expert who made every effort to act as a liaison between prospective employers and the claimant; that all efforts toward these ends [were] met with resis-tence; the claimant’s medical proof falls short of providing him with the necessary support for an award of permanent disability; to the contrary, the medical evaluators and physicians found his results in their estimation to be less than reliable based on his subjective continued complaints of pain and discomfort despite the fact there was no objective explanation for his claims of the severity of his symptoms.
II. The Lott Decision
¶ 25. In considering the case at hand, we are guided by the supreme court’s recent decision in Lott v. Hudspeth Center, 26 So.3d 1044 (Miss.2010).[5] In that case, Martha Lott suffered a work-related shoulder injury while employed by Kilmi-chael Group Home, which is owned by Hudspeth Center. Id. at (¶ 2). Prior to undergoing surgery for her injury, Lott was terminated from her employment. Id. at (¶ 3). She began to search for other jobs about five months after her original injury. Id. The record indicated Lott inquired about or applied for 194 jobs, both in her own community and in the surrounding community. Id. at (¶ 6). Lott never reapplied to her former employer or *1167 inquired about employment there. Id. at (¶21).
¶ 26. One of Lott’s physicians, Dr. Asa Bennett, conducted a physical examination and afterward released Lott without any work restrictions. Id. at (¶ 3). Hud-speth’s carrier then referred Lott to Dr. David Collipp for a second evaluation. Id. at (¶ 5). Dr. Collipp found that Lott was unable to lift 100 pounds, so Dr. Collipp restricted Lott’s lifting in the workplace to a 60-pound maximum. This was the only restriction imposed by Dr. Collipp. Id.
¶ 27. A vocational expert for Hudspeth and its carrier claimed Lott never requested his services in finding employment. Id. at (¶ 7). He also testified the unemployment rate of the county where Lott had been employed was higher than the state average, which had limited Lott’s employa-bility as much as her injury. Id.
¶ 28. The ALJ found Lott was entitled to permanent total disability benefits. Id. at (¶ 8). The Commission reversed, finding Lott was only entitled to permanent partial disability benefits for injury to a scheduled member. Id. The circuit court affirmed. Id. at (¶ 9). On appeal, this Court held the Commission had applied the incorrect legal standard in failing to address whether Lott had established a prima facie case of total disability. Id. at (¶ 17). This Court also concluded that Lott had established a prima facie case of total disability that Hudspeth had failed to rebut. Id. at (¶ 10). We therefore reversed the Commission’s finding of permanent partial disability and rendered judgment that Lott was entitled to permanent total disability benefits. Id. at (¶ 10).
¶ 29. On certiorari, the supreme court reversed, finding the Commission did not apply an incorrect legal standard and that the Commission’s decision was supported by substantial evidence. Id. at (¶¶ 17, 24). The supreme court held the Commission did not apply an incorrect standard because it found Lott failed to prove loss of wage-earning capacity, and accordingly failed to prove a prima facie case of total disability. Id. at (¶ 18). This was true even though the Commission made no findings on whether Lott had made a prima facie case of total disability by showing a reasonable but unsuccessful job search. Id. at (¶¶ 17-18). The supreme court then relied on its prior decision in Taplin, which stated that a prerequisite to a finding of disability is a finding “that the claimant could not obtain work in similar or other jobs and that the claimant’s unemployability was due to the injury in question.” Id. at (¶ 19) (quoting Taplin, 586 So.2d at 828). The supreme court in Lott also reasoned that Mississippi Code Annotated section 71-3-3, which defines “disability,” makes abundantly clear that a finding of disability requires that unemployability be because of one’s injury. Id. at n. 1. According to the recent Lott decision, only after this showing of disability is made do considerations of loss of earning capacity and job search efforts need to be analyzed. Id.
¶ 30. The supreme court acknowledged that Lott may have conducted an extensive job search. Id. at (¶ 20). Indeed, the record showed Lott had applied for or inquired about 194 positions. Id. Nevertheless, the supreme court found the Commission’s decision was based on substantial evidence that Lott’s unsuccessful job search was not due to her workplace injury. Id. at (¶¶ 19-20). The supreme court cited the following facts as important to its holding: (1) Dr. Bennett released her without any work restrictions; (2) Dr. Col-lipp only imposed the restriction that she not lift over sixty pounds; (3) the unemployment rate in Lott’s county of residence was high, which limited Lott’s ability to find work; and (4) Lott never reapplied or *1168 sought information from Hudspeth regarding her employment. Id. at (¶ 20-22).
¶ 31. Applying Lott to the present facts, we conclude the Commission’s decision is based on substantial evidence. We also conclude the Commission applied the correct legal standard notwithstanding its failure to cite the Jordan/Thompson test.
¶ 32. Just as in Lott, the Commission did not apply the burden-shifting analysis, but found that Smith had failed to prove a prima facie case of total disability for reasons independent of his job-search efforts. Another parallel to Lott was Smith’s release by both Dr. Chang and Dr. Vohra without work restrictions. Also similar to Lott, the record indicates Smith did not reapply or make an otherwise diligent effort to return to work at Johnston Tombig-bee after reaching MMI. Dr. Chang, who treated Smith extensively for about a year and a half, was never able to explain Smith’s subjective complaints about pain in his right leg. Dr. Leis, to whom Smith was referred by Dr. Chang to conduct nerve studies, was likewise unable to explain Smith’s complaints of decreased sensation in his leg. Furthermore, Dr. Vohra agreed with Dr. Leis’s assessment that many of Smith’s complaints were non-physiologic. Under these circumstances, we find the Commission did not err in concluding that Smith had failed to establish a prima facie case of permanent total disability.
¶ 33. Our holding in Hill is also instructive. In Hill, the claimant’s lawyer sent a letter to the claimant’s former employer (following the date of MMI) inquiring about job openings within the claimant’s physicians’ restrictions. Hill, 989 So.2d at 971 (¶ 7). The employer responded that no such positions were available. Id. On appeal to this Court, the claimant argued he had made a prima facie showing of total disability due to the employer’s refusal to rehire him. Id. at 971-72 (¶ 12). However, we rejected the view that the claimant had established permanent total disability because the claimant in fact had the capacity to earn post-injury wages. Id. at 972-73 (¶¶ 14, 16). Thus, we affirmed the Commission’s finding that the claimant should receive twenty-percent (20%) permanent partial disability benefits. Id. at 972-73 (¶¶ 9, 20).
¶ 34. Although Smith is claiming to have established a prima facie case for a different reason than in Hill (i.e., reasonableness of his job search rather than the employer’s refusal to rehire upon the former employee’s MMI), we find Hill’s reasoning equally applicable to the situation before us. Mindful that “the ability to earn post-injury wages, even significantly diminished post-injury wages, defeats a claim of permanent total disability,” see id. at 972 (¶ 14), we find ample support for the Commission’s decision that Smith was not entitled to permanent total disability benefits.
¶ 35. We decline the temptation to reweigh the conflicting evidence in this case or to make witness-credibility determinations. This was the province of the Commission, and we refuse to substitute our judgment for its own. Accordingly, we affirm the circuit court’s decision.
¶ 36. THE JUDGMENT OF THE CIRCUIT COURT OF LOWNDES COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., IRVING, GRIFFIS, ISHEE AND ROBERTS, JJ., CONCUR. KING, C.J., CONCURS IN RESULT ONLY. BARNES, J., NOT PARTICIPATING.

. The parties agree that this is the correct date for Smith's MMI.

. The record indicates Dr. Chang had previously (several months earlier) restricted Smith to light-duty work for six months.

. Dr. Vohra recommended Smith undergo a functional capacity evaluation (FCE), but the record indicates no FCE was ever performed.

. Compensation for permanent total disability is to be paid as follows:
[S]ixty-six and two-thirds percent (66-2/3%) of the average weekly wages of the injured employee, subject to the maximum limitations as to weekly benefits as set up in this chapter, shall be paid to the employee not to exceed four hundred fifty (450) weeks or an amount greater than the multiple of four hundred fifty (450) weeks times sixty-six and two-thirds percent (66-2/3%) of the average weekly wage for the state.
Miss.Code Ann. § 71-3-17(a).

. A final mandate in Lott was issued on January 28, 2010.